**In re James and Linda MORGAN,**

**James and Linda Morgan, Plaintiffs,**

**v.**

**Jo–Ann Goldman, Chapter 13 Trustee; Bank of America; et al., Defendants.**

**Bankruptcy No. 5:03–bk–12580M.
Adversary No. 5:05–ap–1244.**

United States Bankruptcy Court,
E.D. Arkansas,
Pine Bluff Division.

Oct. 10, 2006.

---

G. Gregory Niblock, Niblock & Associates, Stuttgart, AR, for Plaintiffs.

## AMENDED ORDER

JAMES G. MIXON, Bankruptcy Judge.

On June 22, 2006, the Court issued its Order to Show Cause why the Debtors,

James and Linda Morgan, and Jo–Ann Goldman, the Chapter 13 Trustee, should not be required to reimburse the estate the sum of $10,000.00 refunded by the Trustee to the Debtors on May 18, 2005. The Debtors were also ordered to file an accounting showing how the funds were used.

The Debtors filed the accounting on July 6, 2006, and an amended accounting on July 26, 2006, as requested. A hearing was held in Pine Bluff, Arkansas, on July 5, 2006, and the matter was taken under advisement. The Court will consider the record made at the July 5, 2006 hearing and at a May 10, 2006 hearing on a complaint for turnover in the above-styled adversary proceeding.

### BACKGROUND

James and Linda Morgan ("Debtors") filed a voluntary petition for relief under the provisions of Chapter 13 of the United States Bankruptcy Code on March 3, 2003. The accompanying schedules contained no priority creditors; two secured creditors, including Dewitt Bank & Trust; and general unsecured creditors with claims totaling $40,456.57. The original plan of reorganization was filed with the petition and schedules. On May 29, 2003, the Debtors proposed an amended Chapter 13 plan, which was confirmed on June 26, 2003. Later they proposed a second modified plan on July 1, 2003, and it was confirmed on July 30, 2003.

The second modified plan confirmed on July 30, 2003, which incorporated provisions of the original and first modified plans, contained the following relevant provisions:

1. The plan length would remain 58 months in duration.

2. Payment to the Trustee was set at $775.00 per month.

3. The Debtors were required to submit all projected disposable income for the benefit of unsecured creditors during the first 36 months of the plan in accordance with 11 U.S.C. § 1325.

4. One secured debt not to extend beyond the length of the plan was described as follows:

| | Value | Net Payoff | Interest Rate |
|---|---|---|---|
| a. DeWitt Bank & Trust | $32,500 | $32,500 | 6% |

5. Non-priority, unsecured creditors were to receive a pro-rata dividend from funds remaining after payment of administrative, secured, priority, child support, and special non-profit unsecured claims.

6. Language in the plan further stated, "In order to assist the debtor in performance of the plan, the Trustee may from time to time grant refunds to the debtors as may be necessary to satisfactorily complete the plan, **provided that all sums necessary to complete the plan are ultimately paid by the debtors.**" (Emphasis added.)

(Pl.'s Ex. 1, May 10, 2006 Hearing.)

On March 29, 2005, the Debtors filed a motion to settle a tort claim that had been scheduled, but valued at "unknown." (Trustee's Ex. 1, May 10, 2006 Hearing.) The motion proposed the following settlement:

That, subject to approval by this Honorable Court, a negotiated settlement has been reached between Obligor and the Debtors (after filing suit) wherein Obligor would pay $50,685.00, and Debtors proposes [sic] to disburse said funds as follows: $15,741.46 as attorney's fees; $1,024.39 as cost of prosecution; and $3,863.12 Medicare Lien; with a net recovery of $30,056.03 to Debtors to be utilized as follows: Funds to be remitted to the Chapter 13 Trustee to be distrib-

uted pursuant to Debtors' confirmed plan with the exception that Debtors will be allowed to request a refund in a sum sufficient to replace the roof on their home and repair Debtors' vehicle.

(Pl.'s Ex. 2, Motion to Settle Claim, May 10, 2006 Hearing.)

The order of settlement was prepared by counsel for the Debtors, and it omitted any reference to the deduction for a medicare lien. The settlement, approved April 26, 2005, provided that

said motion appears proper, and same is hereby GRANTED, and Debtors are authorized to settle the claim with Ronald Adams for the gross sum of $50,685.00, and execute all documents necessary to bring the claim to resolution, and disburse said funds as follows: $15,741.46 as an attorney's fee and $1,024.39 as costs of prosecution of the claim herein to Attorneys Gary Eubanks & Associates; and $30,056.03 to be utilized as follows: Said funds shall be paid to the Chapter 13 Trustee Jo–Ann Goldman and Debtors may apply for a refund from said funds.

(Pl.'s Ex. 4, Order Granting Settlement of Claim, May 10, 2006 Hearing.)

Thereafter, on May 6, 2005, the Debtors' attorney, Jeremy Bueker, sent an e-mail to Sharon Sapp (apparently an employee of the Chapter 13 Trustee's office). The e-mail made the following request:

From: jeremey bueker

Sent: Friday, May 6, 2005 4:51 PM

To: Sharon Sapp

Subject: James and Linda Morgan; BR Case No.:5:03–bk–12580; Refund Request

Dear Ms. Sapp:

On behalf of the above debtors, I request a one time debtor refund in the amount of $9,094.17, which sum represents the materials for a new roof, labor for installing the roof, and repairs on the vehicle. Attached are estimates for the building materials and the repairs on the vehcile [sic].

The cost of labor for installing the roof is an estimate which Mr. Morgan obtained from a guy who does handyman work and is $2500.00. The handyman does not provide estimates as he apparently does not pay income taxes. Mr. Morgan states that although he is disabled he is capable of doing the work on the roof himself but would much prefer that it be done by the handyman.

If the refund or part of it is granted, please send the funds directly to Mr. and Mrs. Morgan.

Thanks,

Jeremy Bueker

Attached to the e-mail was a written estimate for the repairs of the Debtors' roof for $8389.43, including labor at $2500.00, and repair of a vehicle for $704.74.[1] On May 18, 2005, the Trustee issued a check to the Debtor, James Morgan, in the sum of $10,000.00 from the proceeds of the settlement of $30,056.00 received by the Trustee on May 5, 2005. (Pl.'s Ex. 5, May 10, 2006 Hearing.) The balance of the tort settlement was distributed to unsecured creditors pursuant to the plan.

### THE TRUSTEE'S ARGUMENTS

The Trustee argues that $20,000.00 of the $30,000.00 proceeds from the personal injury tort claim was disposable income for the purposes of Chapter 13, citing *Watters v. McRoberts*, 167 B.R. 146 (S.D.Ill.1994);

---

**1.** Both the e-mail and the written estimate were not made part of the record but were attached to the Trustee's brief. They are considered here in the interest of justice.

*In re Pendleton,* 225 B.R. 425 (Bankr. E.D.Ark.1998). The Trustee determined that $10,000.00 of the $30,000.00 would not constitute disposable income because said sum was "needed to be expended for the reasonable support of the Debtors pursuant to 11 U.S.C. § 1325(b)(2)." (Trustee's Brief at 3–4.)

■ If the plan provides, as this one did, that the Debtors will pay all of their projected disposable income received during the first 36 months of the plan to the Trustee, then the amount of projected disposable income is determined by calculating what the debtor's projected gross income will be and then subtracting all reasonable expenses necessary to meet the debtor's needs. *Cameron v. Cameron (In re Cameron),* 243 B.R. 117 (M.D.Ala.1999)(difference between debtor's income and necessary expenses is disposable income). This calculation is made on Schedule J—Current Expenditures of Individual Debtors. In this case, the Debtors' disposable monthly income was listed by the Debtors at $2048.70 and their expenses were listed at $1110.00, which left a monthly amount of $939.00 available to pay the Trustee.

The Debtors have never amended their Schedule J to reflect the alleged additional expenses of roof and auto repairs and have not modified the plan to reflect how the additional income from the tort settlement would be disbursed. Without recognizing the inaccuracy of Schedule J, without any notice to creditors, and without requiring the Debtors to follow the established procedure for confirming modified plans, the Trustee acted as if she possessed judicial authority to determine how the tort proceeds should be disbursed. The Trustee made the $10,000.00 "refund" to the Debt-

ors outside the terms of the confirmed Chapter 13 plan.[2]

■ The Trustee makes a second argument that the disbursement of the $10,000.00 was lawful. She points to language in the plan and the confirmation order specifically allowing for the possibility of a refund to the debtor. The plan states,

In order to assist the debtor in the performance of the plan, the Trustee may from time to time grant refunds to the debtor as may be necessary to satisfactorily complete the plan, provided that all sums necessary to complete the plan are ultimately paid by the debtor.

(Pl.'s Ex. 1, Chapter 13 Narrative Statement of Plan, May 10, 2006 hearing.) Substantially similar language also appears in the Court's Order confirming the plan.

The types of refunds referred to in the plan and confirmation order were meant to provide funds to meet small emergency situations that may arise during the course of a chapter 13 case. They amount to a deferral of a plan payment or two in an administratively convenient procedure to save the additional time and expense of filing an amended plan involving only a few hundred dollars. The safeguard to the creditors is that the plan still provides that the debtor has to make all payments provided for under the plan, presumably by extending the length of the plan or increasing some plan payments. Otherwise, the debtor will not receive a discharge.

The parties all agree that in this case, the $10,000.00 payment was never contemplated to be repaid. Therefore, this distribution does not come within the language

---

**2.** The Debtors only requested $9094.17, which the Trustee generously rounded off to $10,000.00.

regarding refunds contained in the plan and the order confirming the plan.

■ The Trustee further argues that the disbursement of $10,000.00 to the Debtor is authorized by section 1302(b)(4) of the Bankruptcy Code. That section provides that "[t]he trustee shall ... (4) advise, other than on legal matters, and assist the debtor in performance under the plan...." 11 U.S.C. § 1302(b)(4)(2000).

There is nothing in the text of 11 U.S.C. § 1302(b)(4) that even remotely suggests that the Chapter 13 Trustee is vested with discretion to permanently divert monies in her possession to the debtors outside the provisions of a confirmed plan. The editors of a leading treatise on bankruptcy offer the following explanation of the purpose of this section:

[j] Assisting the Debtor in Performance under the Plan; § 1302(b)(4).

Under the Code, the chapter 13 trustee is directed, that is to say, required, rather than merely permitted, to assist the debtor in performance under the plan. The chapter 13 trustee may not become a mere disinterested bystander once the plan has been confirmed, but is to assist the debtor by advising of the means available to the debtor for facilitating performance under the plan, including advice concerning such matters as reductions and suspensions of payments, postpetition collection efforts by creditors against the debtor and codebtors, payment orders, postpetition credit problems and the assumption or rejection of executory contracts.

8 Collier on Bankruptcy ¶ 1302.03[1][j] (Alan N. Resnick & Henry J. Sommer et al., eds., 15th ed. rev.1993).

The bankruptcy courts in this district have granted substantial discretion and power to the office of the Standing Chapter 13 Trustee. For instance, no confirmation hearing in a Chapter 13 case is conducted unless a party in interest objects to the plan. The order confirming a plan is generated by the Chapter 13 Trustee, and the Court's signature is affixed to the order by the Chapter 13 Trustee with the Court's specific permission.

■ Key to the procedures for confirming plans and amended plans in this district is the requirement that the debtor's plan and schedules clearly state how the debtor intends to distribute his future income and that notice of the debtor's intention expressed in the plan and opportunity to object is given to creditors. This procedure satisfies the statutory requirements of a hearing on confirmation required by sections 1324 and 102(1)(B)(i) of the United States Bankruptcy Code. See Roberts v. Pierce (In re Pierce), 435 F.3d 891, 892 (8th Cir.2006)(holding bankruptcy court did not err in failing to hold hearing on objection to claim since claimant had received notice of opportunity to respond to objection and failed to respond); Morlan v. Universal Guar. Life Ins. Co., 298 F.3d 609, 618 (7th Cir.2002) (stating that under the Bankruptcy Code, "notice and hearing" means notice and opportunity for hearing).

Unsecured creditors, in particular, rely on the Chapter 13 Trustee to object to confirmation if a plan does not comply with the Code. For instance, if the debtor claims expenses on Schedule J that are excessive or unwarranted, the Chapter 13 Trustee will object to confirmation. The entire system is corrupted when the debtor's proposed distribution is negotiated in private consultations between the debtor's counsel and the Chapter 13 Trustee and accomplished without affording creditors notice and opportunity to object.

The Court is aware that for many years it has been the practice of the Chapter 13 Trustee to grant refunds that would subsequently be repaid by the debtor. Howev-

er, any type of refund based on 11 U.S.C. § 1302(b)(4), especially without notice to creditors, is of doubtful legality, and the Court is reviewing this practice for future cases.

■ In the instant case, the Court concludes that the Trustee willfully violated her fiduciary duties in personally authorizing the $10,000.00 refund to the Debtors. She acted with total disregard for the statutory requirements for the disbursement of estate funds. With regard to the chapter 13 trustee's duties in disbursing funds, the editors of Collier on Bankruptcy have stated that a chapter 13 plan "must provide for the submission to the control of the trustee of whatever portion of the future income of the debtor is required to effectuate the plan. All such monies must be accounted for by the chapter 13 trustee and distributed in accordance with a confirmed chapter 13 plan ... if monies or property are improperly distributed by the chapter 13 trustee, the trustee is liable for such improper distribution ..." 8 Collier on Bankruptcy at ¶ 1302.03[1][a].

*See also Nash v. Kester (In re Nash),* 765 F.2d 1410, 1415 (9th Cir.1985) (holding the chapter 13 trustee liable for improper distribution not made pursuant to confirmed plan); *Ford Motor Co. v. Stevens (In re Stevens),* 130 F.3d 1027 (11th Cir. 1997) (stating trustee's action was not authorized by the Code and affirmatively violated the trustee's statutory obligation to make payments to all creditors under the terms of the confirmed plan).

The Court has no alternative but to order the Trustee, Jo–Ann Goldman, to forthwith reimburse the estate the sum of $10,000.00 plus interest at the legal rate calculated from May 18, 2005 until paid. She is further ordered that upon reimbursing the estate she shall forthwith make distribution of said sum to the unsecured creditors pro rata according to the terms

of the confirmed plan then in effect in May 2005.

## THE DEBTORS' USE OF THE REFUND

The Debtors' accounting and testimony revealed that they did not spend the money for the purposes represented in the request for refund. The $10,000.00 was deposited into the Debtors' checking account at Dewitt Bank & Trust on May 23, 2005, less $500.00 cash retained by the Debtors. A summary of the relevant portions of the accounting is attached as Exhibit 1. The Debtors' supplemental accounting is attached as Exhibit 2.

Debtor James Morgan testified at the hearing on July 5, 2006, admitting that he used part of the $10,000.00 refund for gambling. He testified,

Q. All right. United Bank over at Lula, Mississippi, $104. Were you over there gambling?

A. I could have been.

Q. Isle of Capri?

A. I was gambling.

Q. That was gambling? $400, right?

A. I think we spent the night over there that night.

Q. Oh, not 400. It's 400—600, 700, 800—it's $1,300?

A. Could have been. It might have been a little more than that. I think I had some money in my pocket.

Q. You didn't have a good day?

A. No, I didn't.

Q. 1,300 bucks. Then the Riveria Hotel for 675?

A. That's right.

Q. Where was that?

A. Probably Las Vegas.

Q. You went gambling at Las Vegas?

A. I stopped in Las Vegas and did a little gambling. I was broke down there. I didn't spend all the money in the casino. I did spend some money down there.

Q. Well, how many nights did you stay?

A. One night.

Q. Well, you didn't pay 675 for one night?

A. No, not for one motel room. No, sir.

Q. That includes some gambling?

A. We had two dogs with us. We had to room them. We had to room ourselves. We had to feed all of us. My truck was broke down. I paid cash on repairing my truck, the water pump.

Q. Yeah, at the Riveria—

A. We gambled at the—one of the casinos. I don't remember which one. Didn't win any money there either.

(Tr. at 33–34, July 5, 2006 Hearing.)

Q. You were back at the Isle of Capri in May too, weren't you?

A. I'm not sure what month it was but, yes, sir.

Q. 160 bucks. Show me on here the checks you used to repair the roof?

A. I'm not sure it's even in this bank statement, sir. I'm not sure that it's—

Q. That's where you put the 10,000 though? That's where you put the—

A. When I requested that, they told me I needed to come up with an estimate of what it would cost to repair my roof. I did that.

Q. I understand. But that's where—

A. They told me to come up—

Q. —that's where you put the 10,000. So are there any checks in there repairing the roof?

A. I mean, I don't know that there are. I haven't looked at this, sir. I paid money out of my pocket, cash, and some checks. I don't know that they came out in this bank statement. They may be in another bank statement.

A. Those bank statements—

A. The biggest part of the money did not go to repair my roof because there was not enough money to replace my roof. The estimate to replace my roof was going to be 12-grand.

Q. Okay.

A. So instead of replacing the roof, I patched it. It got it to stop leaking. I did the repairs on my truck. Then I started making my payments. And that money that I received from them helped me make those payments back to Ms. Goldman.

· · ·

Q. How much did you pay on your roof?

A. I'm going to venture to say that I've paid out of pocket expenses, and I think I wrote two labor checks, in the amount of approximately $1,000.

Q. All right.

(Tr. at 36–38, July 5, 2006 Hearing.)

The Debtors never provided any records at the hearing showing repairs to their roof although some of the checks do indicate money was used for repairs to the Debtors' truck. Mr. Morgan denied that two checks to First National Bank of Dewitt were for a loan payment,[3] but in the

---

**3.** On examination by the Court, the Debtor testified,

supplemental accounting, the records show these checks were payments on a debt to First National Bank of Dewitt secured by two vehicles, neither of which appear in the schedules. (Trustee's Ex. 1, May 10, 2006 Hearing.) The Debtors have apparently incurred post-petition secured debt and purchased two vehicles without notice to creditors or a court order. The Debtor's testimony that the two checks payable to First National Bank of Dewitt for $293.72 were transfers to the Debtor's wife's account was simply perjured testimony.

The Debtors co-mingled the $10,000.00 with other income. The evidence is clear that the Debtors spent at least $1468.00, and probably more in cash, in a two-month period gambling in Mississippi and Nevada. They made a plan payment of $775.00 on the same day the $9500.00 was deposited; spent at least a large portion of $800.00 to attend a family reunion in Paris, Texas; and paid $2305.76 on post-petition credit card debts to Direct Merchant Credit Card and Telco Credit Union. The Supplemental Accounting lists these debts as associated with the Debtor's pilot-escort business, but no such business is disclosed on Schedule I or the Statement of Financial Affairs, neither of which has been amended since the bankruptcy was filed.

Also during the two-month period after the refund was received, Mrs. Morgan purchased $137.71 worth of magazines from Publishers Clearing House and presumably made a gift of $181.17 to United Helping Hand. The Debtors also made numerous payments on life insurance policies that are not disclosed as expenses on Schedule J.

Q. ... What's the purpose of the check to First National Bank, dated 6/18/05, for $293.72?
A. I was putting some money in my wife's account. She's got an account in that bank.

The Supplemental Accounting also revealed that the Debtors received directly from Gary Eubanks & Associates the additional sum of $1408.01, which was part of the proceeds of the tort claim represented to be overpayment of a medicare lien. This money had been ordered disbursed to the Trustee. (Pl.'s Ex. 4, Order Granting Motion to Settle, May 10, 2006 Hearing.)

In the months of May and June, the Debtors' account showed deposits of $16,007.91. By the end of June, the Debtors' bank account was reduced to $330.00. Mrs. Morgan's account showed one deposit in May and June of $505.00 that represented social security benefits.

Mr. Morgan testified that the roof estimate was $12,000.00, but the estimate he submitted to the Trustee was $8,389.43. The Trustee had no authority to make the $10,000.00 payment in the first instance, and the Debtors compounded the Trustee's error by misspending the money.

The Debtors are guilty of fraud on the Court. They misrepresented the purpose for their request for a refund and spent the money as fast as they could, including funding some high living at the gambling casinos in Mississippi and Nevada.

Therefore, the Debtors are ordered to reimburse Jo–Ann Goldman, Chapter 13 Trustee, the sum of $10,000.00 plus interest at the legal rate from the date the money was received by the Debtors until paid. Failure of the Debtors to repay the Trustee will result in a dismissal of the case and referral to the U.S. Attorney for possible criminal sanctions.

IT IS SO ORDERED.

Q. All right. That's not a note payment to the bank?
A. No.
(Tr. at 33, July 5, 2006 hearing.)

## EXHIBIT 1

Among the checks shown in the accounting were the following written on an account at Dewitt Bank & Trust:

| CHECK NO. | DATE | PAYEE | AMOUNT |
|---|---|---|---|
| 4737 | 5/23/05 | Jo–Ann Goldman | $ 775.00 |
| 4744 | 5/23/05 | First National Bank | $ 293.72 |
| e-check | 5/24/05 | Isle of Capri | $ 160.00 |

The bank statement for May showed a deposit of $9500.00, representing the refund check less $500.00, and other deposits totaling $5068.91. The bank statement for June 2005 indicates checks clearing the account included the following:

| CHECK NO. | DATE | PAYEE | AMOUNT |
|---|---|---|---|
| e-check | 6/09/05 | Riviera Hotel | $ 675.00 |
| e-check | 6/14/05 | Isle of Capri | $ 400.00 |
| e-check | 6/15/05 | Isle of Capri | $ 200.00 |
| withdrawal | 6/20/05 | United Bank, Lula, MS | $ 104.00 |
| withdrawal | 6/20/05 | United Bank, Lula, MS | $ 104.00 |
| e-check | 6/21/05 | Isle of Capri | $ 200.00 |
| e-check | 6/21/05 | Isle of Capri | $ 300.00 |
| 4753 | 5/28/05 | Pep Boys (repair on truck) | $ 583.24 |
| 4769 | 6/18/05 | First National Bank | $ 293.72 |

In the supplemental accounting ordered by the Court the Debtors represented the following:

5/26/06 [4] Debtor used some cash funds to replace a fuel pump on a 1997 Chevrolet Truck.

5/10/06 Debtor paid insurance premium of $188.59 on 1997 Chevrolet Truck.

5/28/06 Check 4744 to First National Bank of $293.72 was payment on note for 1997 Chevrolet Truck and 1996 Grand Am

6/18/06 Check 4769 to First National Bank of $293.72 was payment on note for 1997 Chevrolet Truck and 1996 Grand Am

The accounting also showed the Mrs. Morgan wrote the following checks:

| CHECK NO. | DATE | PAYEE | AMOUNT |
|---|---|---|---|
| 4747 | 5/23/05 | Publishers Clearing House | $ 21.92 |
| 4748 | 5/23/05 | Publishers Clearing House | $ 20.48 |
| 4749 | 5/23/05 | Publishers Clearing House | $ 49.92 |
| 4750 | 5/23/05 | Publishers Clearing House | $ 45.39 |
| 4743 | 5/23/05 | United Helping Hand | $ 181.17 |

## EXHIBIT "2"
### PLAINTIFFS' AMENDED ACCOUNTING

Comes now the Plaintiffs above by and through their undersigned attorneys, and for their Amended Accounting doth state as follows:

| DATE | TRANSACTION | AMOUNT | EXPLAIN |
|---|---|---|---|
| 5/06/06 | Deposit | $149.60 | What is source of deposit? |

G & J Escort Pay which is money received from work performed by Plaintiffs performing pilot car service work.

| 5/10/06 | Deposit | $300.00 | What is source of deposit? |
|---|---|---|---|

Landlock Marina Escort Pay which is money received from work performed by Plaintiffs performing pilot car service work.

| 5/13/06 | Deposit | $331.50 | What is source of deposit? |
|---|---|---|---|

G & J Escort Pay which is money received from work performed by Plaintiffs performing pilot car service work.

| 5/23/06 | Deposit | $9,500.00 | What happened to $500.00? |
|---|---|---|---|

Paid cash for labor performed on roof and possibly bought groceries or aid miscellaneous bills with cash.

| 5/26/06 | Deposit | $3,148.81 | What is the source of deposit? |
|---|---|---|---|

4. Some of the entries in the Supplemental Accounting are incorrectly dated with the year 2006 but all relevant transactions occurred in 2005.

There were three checks which were the source of this deposit. Nuckle Brothers in the amount of $576.80 was for work performed by Plaintiffs performing pilot car service work. Gary Eubanks in the amount $1408.01 was for Medicare overpayment which was refunded to Gary Eubanks and was remitted to debtors. G & J Escort Service $1964.00 was for work performed by Plaintiffs performing pilot car service work. Plaintiffs retained $800.00 cash and the funds were used to attend a family reunion in Paris, Texas and to replace fuel pump on 1997 Chevrolet Truck.

DISBURSEMENTS:

| DATE | REASON PAID | PAYEE | AMOUNT | PROVIDE |
|------|-------------|-------|--------|---------|
| 5/04/06 | Insurance Premium | Life of Georgia | $ 49.74 | Details of Policy |

This is term life insurance on each of the Plaintiffs. Plaintiffs believe that the coverage amount is $3,000 for each of them but are not completely sure. Plaintiffs' insurance agent is Lester Seber in DeWitt, Arkansas.

| DATE | REASON PAID | PAYEE | AMOUNT | PROVIDE |
|------|-------------|-------|--------|---------|
| 5/06/06 | Insurance Premium | State Farm | $ 57.95 | Details of Policy |

This is car insurance on Plaintiffs' 1996 Grand Am which include comprehensive and collision.

| 5/09/06 | Insurance Premium | Surety Life | $ 31.03 | Details of Policy |
|------|-------------|-------|--------|---------|

This is term life insurance on one of the Plaintiffs. Plaintiffs believe that the coverage amount is $3000.00. Plaintiffs' insurance agent is Lester Seber in DeWitt, Arkansas.

| 5/09/06 | Insurance Premium | Surety Life | $ 33.70 | Details of Policy |
|------|-------------|-------|--------|---------|

This is term life insurance on one of the Plaintiffs. Plaintiffs believe that the coverage amount is $3000.00. Plaintiffs' insurance agent is Lester Seber in DeWitt, Arkansas.

| 5/10/06 | Insurance Premium | Progressive | $ 188.59 | Details of Policy |
|------|-------------|-------|--------|---------|

This is car insurance on Plaintiffs' 1997 Chevrolet Truck which is used in the pilot car service. This is a commercial policy with $1,000,000.00 in liability coverage which is required for the pilot car service.

| 5/23/06 | Check 4735 | Household Credit Ser. | $ 727.82 | What was purchased? |
|------|-------------|-------|--------|---------|

Gas and hotel rooms related to the pilot car service.

| 5/26/06 | Check 4734 | DeWitt Bank & Trust | $1,367.75 | Purpose of check- Payment of what debt? |
|------|-------------|-------|--------|---------|

This check was not written to DeWitt Bank & Trust. It was written to Direct Merchant Credit Card and paid the balance on that credit card off. This credit card is used for business expenses related to the pilot car service. Most of the balance on this card was due to repairs on the 1997 Chevrolet Truck which is used in the pilot car service.

| 5/28/06 | Check 4744 | First Nat'l Bank | $ 293.72 | Purpose of Check- Is check a payment of installment debt? |
|------|-------------|-------|--------|---------|

This is payment for the 1997 Chevrolet Truck and 1996 Grand Am hid are on one installment note.

| 5/31/06 | Check 4736 (Omitted from accounting) | | $ 938.01 | Payment on what credit card? |
|------|-------------|-------|--------|---------|

This was paid to Telco Credit Union and is payment on a credit card which paid the balance on this credit card. This credit card is used for business expenses related to the pilot car service.

| 6/03/06 | Insurance Premium | Life of Georgia | $ 49.75 | Details of Policy |
|------|-------------|-------|--------|---------|

This is term life insurance on each of the Plaintiffs. Plaintiffs believe at the coverage amount is $3,000 for each of them but are not completely sure. Plaintiffs' insurance agent is Lester Seber in DeWitt, Arkansas. Same as above.

| 6/07/06 | Insurance Premium | Surety Life | $ 33.70 | Details of Policy |
|------|-------------|-------|--------|---------|

This is term life insurance on one of the Plaintiffs. Plaintiffs believe that the coverage amount is $3000.00. Plaintiffs' insurance agent is Lester Seber in DeWitt, Arkansas. Same as above.

| 6/07/06 | Insurance Premium | State Farm | $ 57.95 | Details of Policy |
|------|-------------|-------|--------|---------|

This is car insurance on Plaintiffs' 1996 Grand Am which include comprehensive and collision. Same as above.

| 6/08/06 | Insurance Premium | Progressive | $ 181.29 | Details of Policy |
|------|-------------|-------|--------|---------|

This is car insurance on Plaintiffs' 1997 Chevrolet Truck which is used in the pilot car service. This is a commercial policy with $1,000,000.00 in liability coverage which is required for the pilot car service. Same as above.

| 6/18/06 | Check 4769 | First Nat'l Bank | $ 293.72 | Purpose of Check- Is check a payment of installment debt? |
|------|-------------|-------|--------|---------|

This is payment for the 1997 Chevrolet Truck and 1996 Grand Am which are on one installment note.

Bank statements for the First National Bank checking account are a below:

**610**

| DATE | TRANSACTION | AMOUNT | EXPLAIN |
|------|-------------|--------|---------|
| 6/22/05 | Deposit | $505.00 | Source? |

This is Plaintiff Linda Morgan's Social Security check. This is the first Social Security check that she received. She reached age 62 on the 27th day of April 2005.

DISBURSEMENTS:

| DATE | REASON PAID | PAYEE | AMOUNT | PROVIDE |
|------|-------------|-------|--------|---------|
| 5/13/05 | Check 719 | St. Charles Water | $ 39.25 | For what? |
| Payment of water bill | | | | |
| 6/23/05 | Bank Check | DeWitt Bank & Trust | $ 310.00 | For what? |
| To help cover pending transactions in the DeWitt Bank & Trust checking account. | | | | |
| 6/27/05 | Check 721 | Conco | $ 23.54 | For what? |
| Gas in one the vehicles. | | | | |
| 6/28/05 | Check 720 | Exxon | $ 11.93 | For what? |
| Gas in one the vehicles. | | | | |

P.O. Box 511 • DeWitt, Arkansas 72042 • Phone: (870) 946-3551 • Fax: (870) 946-1552
www.fnbdewitt.com

ACCOUNT:           113099     PAGE:   1
DOCUMENTS:          1      05/31/2005

```
LINDA J MORGAN
POD JAMES L MORGAN                                30-0
P O BOX 30                                           0
ST CHARLES AR   72140-0030                            1
```

```
========================================================================
                    CHECKING-CONS ACCOUNT 113099
========================================================================
      DESCRIPTION          DEBITS       CREDITS    DATE       BALANCE

BALANCE LAST STATEMENT ............................. 04/29/05    51.34
CHECK # 719                 39.25                   05/13/05    12.09
SERVICE CHARGE               6.00                   05/31/05     6.09
BALANCE THIS STATEMENT ............................. 05/31/05     6.09

TOTAL CREDITS     (0)         .00   MINIMUM BALANCE            12.09
TOTAL DEBITS      (2)       45.25   AVERAGE BALANCE            28.03

========================================================================
                       YOUR CHECKS SEQUENCED
========================================================================
DATE...CHECK #......AMOUNT DATE...CHECK #......AMOUNT DATE...CHECK #......AMOUNT

05/13    719      39.25

         - - - ITEMIZATION OF SERVICE CHARGE PAID THIS PERIOD - - -

         TOTAL CHARGE FOR NO INT DDA ACCTS:            6.00

                    - END OF STATEMENT -
```

NOTICE: SEE REVERSE SIDE FOR IMPORTANT INFORMATION

719   $39.25   05/13/2005

P.O. Box 511 • DeWitt, Arkansas 72042 • Phone: (870) 946-3551 • Fax: (870) 946-1552
www.fnbdewitt.com

ACCOUNT:       113099    **PAGE:**    1
DOCUMENTS:      3     06/30/2005

LINDA J MORGAN                 30-0
POD JAMES L MORGAN            0
P O BOX 30                       3
ST CHARLES AR   72140-0030

=================================================
CHECKING-CONS ACCOUNT 113099
=================================================

| DESCRIPTION | DEBITS | CREDITS | DATE | BALANCE |
|---|---|---|---|---|
| BALANCE LAST STATEMENT ............................. | | | 05/31/05 | 6.09 |
| US TREASURY 303 SOC SEC XXXXX4483A SSA | | 505.00 | 06/22/05 | 511.09 |
| CHECK | 310.00 | | 06/23/05 | 201.09 |
| CHECK # 721 | 23.54 | | 06/27/05 | 177.55 |
| CHECK # 720 | 11.93 | | 06/28/05 | 165.62 |
| SERVICE CHARGE | 6.00 | | 06/30/05 | 159.62 |
| BALANCE THIS STATEMENT ............................. | | | 06/30/05 | 159.62 |

| TOTAL CREDITS | (1) | 505.00 | MINIMUM BALANCE | 6.09 |
| TOTAL DEBITS | (4) | 351.47 | AVERAGE BALANCE | 70.59 |

=================================================
YOUR CHECKS SEQUENCED
=================================================
DATE...CHECK #......AMOUNT DATE...CHECK #......AMOUNT DATE...CHECK #......AMOUNT

06/23      *     310.00   06/28     720      11.93   06/27     721      23.54

(*) INDICATES A GAP IN CHECK NUMBER SEQUENCE

- - - ITEMIZATION OF SERVICE CHARGE PAID THIS PERIOD - - -

TOTAL CHARGE FOR NO INT DDA ACCTS:       6.00

- END OF STATEMENT -

NOTICE: SEE REVERSE SIDE FOR IMPORTANT INFORMATI

614

0   $310.00   06/23/2005          720   $11.93   06/28/2005

721   $23.54   06/27/2005

LINDA J MORGAN 113099 Page